IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF TEXAS

TYLER DIVISION

| | | |
|---|---|---|
| JOHN EDWARD ADAMS #1345911 | § | |
| v. | § | CIVIL ACTION NO. 6:08cv106 |
| JOHN E. NOLEN, ET AL. | § | |

MEMORANDUM OPINION AND ORDER OF DISMISSAL

The Plaintiff John Adams, an inmate of the Texas Department of Criminal Justice, Correctional Institutions Division proceeding *pro se*, filed this civil rights lawsuit under 42 U.S.C. §1983 complaining of alleged violations of his constitutional rights. The parties have consented to allow the undersigned United States Magistrate Judge to enter final judgment in these proceedings pursuant to 28 U.S.C. 636(c). As Defendants, Adams named physician's assistant John Nolen, Dr. Tito Orig, and the urology clinic at the University of Texas Medical Branch Hospital in Galveston.

An evidentiary hearing was conducted on October 21, 2008. At this hearing and in his complaint, Adams said that he was diagnosed with hepatitis C in 1999. While he was in the Montgomery County Jail in 2005, he had a 14 millimeter kidney stone, which was confirmed at the Byrd Unit. He was told that this stone was too large to pass, so a stent was put in his urethra.

At the time that he filed his lawsuit, Adams said, the stone was 17 mm, and a second one had formed. He was passing blood in his urine. Adams said that Nolen had refused him pain medications which had been prescribed by physicians at the University of Texas Medical Branch hospital in Galveston (UTMB). Adams stated that on June 7, 2007, Nolen said that he was "drug seeking."

Adams stated that Dr. Orig has provided "sporadic" treatment, and has prescribed medications which Adams cannot take because of his hepatitis C. He acknowledged that over the past five or six months, Dr. Orig has been giving him pain medication.

1

Adams noted that he was told at UTMB that he would be set up for surgery, but that this was supposed to have been done in February of 2008. The stent was removed because it was calcifying, but he never had the surgery; most recently, Adams said, he was told that he would have to be checked and X-rayed all over again, re-starting the procedure for surgery.

Nurse Kathy Grey, a correctional nurse also present at the hearing, testified under oath concerning the contents of Adams' medical records. Nurse Grey stated that the stent was put in because of the size of the stone. She said that a stent creates a better pathway for the stone to move, but his stone was too big. The stent was removed in February but the stone was too big for ultrasound, and surgery could not be done because of coagulation problems. Nurse Grey stated that Adams has now been okayed for surgery, but that he has to be checked again to see about blood problems and to check on the stone size and placement. A CT scan was ordered in August, but then Hurricane Ike disrupted the schedules.

In June of 2007, Nurse Grey said, Nolen noted that Adams was "drug-seeking" and that narcotics were not indicated; she stated that inmates seeking narcotics can be a problem within the prison. Nurse Grey added that Nolen had previously referred Adams' chart to the physician and that prescribing Darvocet, a narcotic pain medication, has been discussed with reference to Adams' hepatitis C. Because Darvocet is a blood thinner, Nurse Grey said, it should not be constantly taken, particularly by a patient with hepatitis C.

Adams stated that the hematology department told him not to take so much ibuprofen. He again says that he was told that the stent had to be removed before it calcified, and says that Dr. Orig told him that "somebody dropped the ball." He says that Dr. Hogue told him at one point that he was ready for surgery.

Adams' Medical Records

The Court has received and reviewed copies of Adams' medical records, taking Adams' pleadings and testimony as true and disregarding any information contained in these records which contradicts the Plaintiff's assertions. Varnado v. Collins, 920 F.2d 320, 321 (5th Cir. 1991).

These records show that in June of 2006, Adams was prescribed a medication called oxybutynin, which is given for bladder problems. On November 13, 2006, he complained of problems associated with the kidney stones, and was prescribed Tylenol #3, a narcotic pain reliever, for pain and given a follow-up appointment by video teleconference (referred to as "telemed.") On November 28, 2006, he returned to the clinic complaining of pain, and was given a three-day supply of Tylenol #3 by Nolen.

On January 5, 2007, Adams complained that his urine was "dark," and was given Bactrim, an antibiotic, by Dr. Orig. On January 22, 2007, he was brought to sick call by security with a complaint of blood in his urine and bilateral flank pain. Nolen gave a verbal order for him to get Tylenol #3 and nitrofurantoin, an antibiotic used to treat urinary tract infections. In March of 2007, Adams was again prescribed Tylenol #3 and Bactrim.

On April 10, 2007, Adams complained that his pain medications had run out, and he was prescribed a three-day supply of Tylenol #3. On April 20, his urine was described as "dark amber," and he was prescribed nitrofurantoin and Darvocet, also a narcotic pain reliever. On May 11, 2007, Adams was given a ten-day supply of Darvocet.

On June 4, 2007, Adams was prescribed a three-day supply of Darvocet by Nolen. On June 7, Nolen made a note in the medical records saying that he had consulted with several staff members, and that "my professional option [sic] is that this is drug seeker behavior and narcotics are not indicated." On August 23, 2007, however, Nolen again prescribed Darvocet for Adams.

On June 20, 2007, Dr. Orig noted in the records that he had discussed with Adams the benefits, risks, and complications of taking Darvocet and other opiods, especially with a history of

3

hepatitis C. He ordered abdominal X-rays and prescribed oxybutynin and a ten-day supply of Darvocet. In September of 2007, Dr. Orig stated that a referral for surgery has been done.

On September 9, 2007, Nurse Kamman noted a verbal order received from Dr. Orig for Darvocet, and that an individual named Mrs. Slider was supposed to check on Adams' appointment in Galveston. A month later, on October 8, Nurse Morton noted that Adams was supposed to go back to Galveston in December and that the hospital in Galveston recommended Darvocet, which he apparently received; on November 8, Adams was seen in the clinic complaining of pain and requesting a refill of his Darvocet prescription. The request was sent to Nolen, who ordered a ten-day supply. On November 30, he was again seen by Nurse Morton, who stated that Adams needed a refill of Darvocet, and he was again ordered a ten-day supply.

An entry in the medical records from the Hospital Galveston Urology Clinic dated December 28, 2007, indicates that surgery was not done at that time because of "inc PT" and decreased platelets. The entry indicates that Adams complained of pain in the right upper quadrant and that he had hepatitis C but not HIV. He complained of pain around the stent and of blood in his urine, and wanted the stent removed; he was referred to the hematology department, which said that he had an increased risk of bleeding because of the hepatitis C. The entry stated that Adams needed to come to Galveston for a KUB (i.e. a radiograph of the kidneys, urethra, and bladder), and possible stent exchange or removal based on his labs. An outpatient discharge summary from Hospital Galveston dated February 7, 2008, says that "this patient was in outpatient status to have a cysto stent removal which he had done without any reported problems." There is no indication that Adams was supposed to have any other procedures, such as kidney stone removal, at this time.

In February of 2008, Adams was prescribed a medication called enalapril, for high blood pressure. On February 14, he was given Tylenol #3 for pain, and stated that the pain was relieved. Adams signed his lawsuit on March 4, 2008.

A note on a nursing entry dated June 16, 2008, after the filing of the lawsuit, says that Adams filed a sick call request asking when he was going to go back to UTMB, saying that when he was

there in February, he was told he would return in "a couple of months"; the nurse making the entry stated that there was no indication of a followup with Galveston and that she would schedule an appointment with a medical provider.

In the Step One grievance attached to his complaint, Adams said that on August 9, 2007, he was denied pain medication by Nolen which had been prescribed to him by the doctors in Galveston. The response to this grievance was that the doctors in Galveston only make recommendations and the unit medical providers decide what medications will be ordered, and that Dr. Orig ordered Darvocet for Adams on July 25, 2007, and again on August 16, 2007.

In his Step Two appeal, Adams again complained of the lack of pain medication. The response was that the doctors in Galveston only make recommendations and that Adams had been ordered Darvocet.

In another Step One grievance attached to the complaint, Adams complains that he was in severe pain on August 20, 2007, and his medication had run out; he says that he keeps having to go through the same procedures over and over to get his medication renewed, and that on this occasion, he was told to put in a sick call request instead of being able to go to the clinic. The response was that emergency cases are seen as walk-ins, and that because of the large number of inmates, policies and procedures are followed to maintain order. The response noted that Adams was seen by the doctor on August 23 and prescribed Darvocet that day.

In his appeal of this grievance, Adams complains that he was not treated as a walk-in and that while he was seen on August 23, he was given three days worth of medication and then not seen again for two weeks, and that he has not had a follow-up appointment from a visit to the hematologist in Galveston. The response to this grievance was that the security staff called the clinic and spoke to the nurse, who determined that Adams should file a sick call request, and that dissatisfaction with this decision does not reflect ineffective medical care.

Legal Standards and Analysis

The crux of Adams' claim is the assertion that the Defendants have been deliberately indifferent to his serious medical needs. The Fifth Circuit has held that deliberate indifference to a convicted inmate's serious medical needs could state a civil rights violation, but a showing of nothing more than negligence does not. Norton v. Dimazana, 122 F.3d 286, 291 (5th Cir. 1997); Jackson v. Cain, 864 F.2d 1235, 1246 (5th Cir. 1989). However, simple disagreement with the medical treatment received or a complaint that the treatment received has been unsuccessful is insufficient to set forth a constitutional violation. Johnson v. Treen, 759 F.2d 1236, 1238 (5th Cir. 1985); Norton, 122 F.3d at 293.

Furthermore, malpractice alone is not grounds for a constitutional claim. Varnado v. Collins, 920 F.2d 320, 321 (5th Cir. 1991). Negligent or mistaken medical treatment or judgment does not implicate the Eighth Amendment and does not provide the basis for a civil rights action. Graves v. Hampton, 1 F.3d 315, 319-20 (5th Cir. 1993). The Fifth Circuit has held that the fact that medical care given is not the best that money can buy, and the fact that a dose of medication may occasionally be forgotten, does not amount to deliberate indifference to serious medical needs. Mayweather v. Foti, 958 F.2d 91 (5th Cir. 1992).

More pertinently, the Fifth Circuit has held that an inmate who had been examined by medical personnel on numerous occasions failed to set forth a valid showing of deliberate indifference to serious medical needs. Spears v. McCotter, 766 F.2d 179, 181 (5th Cir. 1985). It should be noted in this regard that medical records of sick calls, examinations, diagnoses, and medications may rebut an inmate's allegations of deliberate indifference to serious medical needs. Banuelos v. McFarland, 41 F.3d 232, 235 (5th Cir. 1995).

In Domino v. TDCJ-ID, 239 F.3d 752 (5th Cir. 2001), a inmate who was a psychiatric patient expressed suicidal ideations and the psychiatrist returned him to his cell after a five-minute examination; the inmate committed suicide two and a half hours later. The Fifth Circuit, in reversing a denial of summary judgment by the district court, stated as follows:

> Deliberate indifference is an extremely high standard to meet. It is indisputable that an incorrect diagnosis by prison medical personnel does not suffice to state a claim

6

> for deliberate indifference. Johnson v. Treen, 759 F.2d 1236, 1238 (5th Cir. 1985). Rather, the plaintiff must show that the officials "refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs." Id. Furthermore, the decision whether to provide additional medical treatment "is a classic example of a matter for medical judgment." Estelle v. Gamble, 429 U.S. 97, 107 (1972). And, "the failure to alleviate a significant risk that [the official] should have perceived, but did not," is insufficient to show deliberate indifference. Farmer v. Brennan, 511 U.S. 825, 838 (1994).

Domino, 239 F.3d at 756.

The case of Stewart v. Murphy, 174 F.3d 530, 534 (5th Cir. 1999), presents an illuminating picture of what does and does not constitute deliberate indifference to serious medical needs. In that case, the plaintiff Eugene Stewart was incarcerated in May of 1993, at which time he was 67 years old and suffering from numerous ailments, including hypertension, arthritis, gout, and heart disease. In August of 1994, he was admitted to the hospital for treatment of swollen legs, a possible indication of congestive heart failure. He was treated for five days and then released, but the next day, the treating physician, Dr. Dial, was notified that Stewart had a large decubitus ulcer (i.e. a bedsore) on his back. He ordered cleansing of the ulcer, treatment with antibiotics, and placement on the sick call list; however, it was not clear why such a wound was not discovered during Stewart's stay in the hospital, rather than after his discharge.

Stewart was readmitted to the prison hospital on September 6, 1994, this time under the care of Dr. Kim. She took cultures from the ulcer, debrided the wounds, and administered antibiotics and IV fluids. Dr. Kim also ordered that the dressings be changed three times a day and that Stewart be repositioned every three hours, but acknowledged that due to staffing problems, the nurses sometimes did not carry out the doctor's orders.

Stewart's ulcers did not improved and he was transferred to a non-prison hospital for consultation and treatment. When he returned, Dr. Kim did not follow the free-world physician's advice to transfer Stewart to another facility for physical therapy. Instead, Dr. Kim ordered that Stewart be kept out of bed as much as possible and that the nurses move his extremities. She also transferred him to the care of another physician, Dr. Knutson.

7

Dr. Knutson treated Stewart's ulcers with medication, ordered that the dressings be changed twice a day, and that Stewart be repositioned every hour. He also checked the wounds periodically and ordered that Stewart get out of bed for extended periods of time.

However, Dr. Knutson conceded that he often did not read the nurses' notes, which said that Stewart had an infection from a catheter, and did not prescribe antibiotics. He did not see Stewart over the Thanksgiving four-day weekend, and saw him next on November 28, 1994, at which time Stewart appeared like he was going to die. Dr. Knutson tried to treat Stewart at the prison hospital but ultimately transferred him to the University of Mississippi Medical Center, where the attending physician stated that Stewart had "the worst bedsores she had ever seen." Stewart died on December 7, 1994.

Stewart's family sued Drs. Dial, Kim, Knutson, and Russell, the medical director at the prison facility. The district court granted summary judgment for the physicians, and an appeal was taken.

On appeal, the Fifth Circuit affirmed the grant of summary judgment. The Fifth Circuit concluded that there was no probative evidence that any of the doctors denied, substantially delayed, or intentionally interfered with treatment; the Court determined that the doctors had provided "active treatment" for Stewart's condition.

Similarly, the evidence in the present case shows that Adams received active treatment for his condition. He was seen on numerous occasions by medical professionals and was given multiple referrals to the urology clinic in Galveston, as shown by the fact that he was seen there in December of 2007 and again in February of 2008. The records from Galveston show that surgery was not done when scheduled because of problems with Adams' blood as a result of his hepatitis C infection, although the stent was removed in February. While Adams complains and the medical records confirm that he did not get pain medications on some occasions, and that on one of these occasions, Nolen noted his opinion that Adams was engaged in "drug seeking behavior" and narcotics were not indicated, the records nonetheless show and Adams does not deny that he received pain medication, including narcotic pain medication such as Darvocet and Tylenol #3, on a large number of occasions,

both before and after Nolen's comment. As noted above, the fact that a dose of medication may occasionally be missed does not amount to deliberate indifference to serious medical needs. Mayweather v. Foti, 958 F.2d at 91.

While it is clear from Adams' testimony, as confirmed by the medical records, that surgery on his kidney stones has been delayed, there is no indication that these delays were the result of deliberate indifference to his medical needs. Adams concedes in his complaint that a procedure in Galveston was canceled because of low platelet count and the fact that his blood was not clotting like it was supposed to. Nor does the fact that Adams did not get to see the doctor every time that he wanted show that such deliberate indifference occurred. Adams simply has not shown that the medical staff refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs. Domino, 239 F.3d at 756. As noted above, even negligence or malpractice would not rise to the level of a constitutional violation. Graves, 1 F.3d at 319-20.

This is true even though the Court does not in any way doubt Adams' testimony that he experienced pain, which at times may well have been severe. The Fifth Circuit has held that complaints by prisoners for negligence on the part of prison officials, even where serious injury occurs, do not set out a valid claim under the Civil Rights Act even if such complaints could be valid under state law. *See* Bowie v. Procunier, 808 F.2d 1142 (5th Cir. 1987). In order to set out a constitutional claim under Section 1983, Adams must show that he suffered deliberate indifference to his serious medical needs; negligence and malpractice do not rise to the level of deliberate indifference and do not set out constitutional claims. Stewart, 170 F.3d at 534; Graves, 1 F.3d at 319-20. The medical care which Adams received may not have been "the best that money can buy," *see* Mayweather, 958 F.2d at 91, but neither does the complaint about it meet the "extremely high standard" which the Fifth Circuit requires for a showing of deliberate indifference. Domino, 239 F.3d at 756. Adams' lawsuit is without merit.

In addition, one of the defendants sued is the urology clinic at the hospital in Galveston. This clinic is simply a sub-unit of the University of Texas Medical Branch, which is an agency of the State of Texas, and has no separate legal existence, and thus cannot be sued in its own name. *See* Darby v. Pasadena Police Department, 939 F.2d 311, 313 (5th Cir. 1991). In addition, as a state agency, the urology clinic enjoys absolute immunity from suit. Pennhurst State School & Hospital v. Halderman, 465 U.S. 89, 101-02 (1984); *accord*, Hafer v. Melo, 112 S.Ct. 358, 363 (1991). To the extent that Adams seeks to sue the urology clinic at the University of Texas Medical Branch Hospital, the claim is barred by sovereign immunity. *See* Alabama v. Pugh, 438 U.S. 781 (1978) (per curiam); Delahoussaye v. City of New Iberia, 937 F.2d 144, 146 (5th Cir. 1991).

Conclusion

28 U.S.C. §1915A requires that as soon as practicable, district courts must review complaints wherein prisoners seek redress from governmental entities or their employees. Section 1915A(b) requires that upon review, the court shall identify cognizable claims or dismiss the complaint or any portion thereof if the complaint is frivolous, malicious, fails to state a claim upon which relief may be granted, or seeks monetary relief from a defendant who is immune from such relief.

The term "frivolous" means that a complaint lacks an arguable basis in law or fact; a complaint is legally frivolous when it is based upon an indisputably meritless legal theory. Neitzke v. Williams, 490 U.S. 319, 325-7 (1989). A complaint fails to state a claim upon which relief may be granted if as a matter of law, it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations. Neitzke v. Williams, 490 U.S. 319, 327, (1989), *citing* Hishon v. King & Spalding, 467 U.S. 69, 73 (1984); *see also* Blackburn v. City of Marshall, 42 F.3d 925, 931 (5th Cir. 1995).

In this case, Adams' complaint lacks any arguable basis in law and fails to state a claim upon which relief may be granted. Consequently, his lawsuit may be dismissed as frivolous under 28 U.S.C. §1915A(b). *See generally* Thompson v. Patteson, 985 F.2d 202 (5th Cir. 1993). It is accordingly

ORDERED that the above-styled civil action be and hereby is DISMISSED with prejudice as frivolous. 28 U.S.C. §1915A. It is further

ORDERED that any and all motions which may be pending in this civil action are hereby DENIED.

So **ORDERED** and **SIGNED** this **2** day of **January, 2009.**

_____
JUDITH K. GUTHRIE
UNITED STATES MAGISTRATE JUDGE